IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY HALL, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. |
| | ) | |
| CITY OF LADUE, MISSOURI, | ) | |
| **Serve: Laura Rider, City Clerk** | ) | |
| **9345 Clayton Road** | ) | |
| **Ladue, Missouri 63124** | ) | |
| | ) | |
| JULIA CREWS, | ) | |
| Individually and in her official capacity, | ) | |
| **Serve: 4731 Rocky Top Lane** | ) | |
| **Hillsboro, Missouri 63050** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KEN ANDRESKI, | ) | |
| Individually and in his official capacity, | ) | |
| **Serve: 9345 Clayton Road** | ) | |
| **Ladue, Missouri 63124** | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

**COMES NOW** Plaintiff Ashley Hall ("Plaintiff"), by and through undersigned counsel, and for her Complaint for Damages, hereby states as follows:

**NATURE OF THE ACTION**

1.     On April 23, 2019, Plaintiff Ashley Hall, an unarmed African American mother of five, was confronted and shot in the back by City of Ladue Police Officer Julia Crews. While she survived the shooting, she suffered grievous injuries. This is a civil rights action brought under 42 U.S.C. § 1983 seeking monetary damages for the tortious actions of Defendant City of Ladue Police Officer Defendant Julia Crews for her unreasonable use of force against the Plaintiff in violation of the Fourth and Fourteenth Amendments to the United States Constitution,

which have left Plaintiff permanently disabled.  Plaintiff also seeks damages against the Defendant City of Ladue, Missouri, and Defendant Ken Andreski, as Chief of Police for the City of Ladue Police Department, for their failure to adequately train and supervise Defendant Crews and other officers, and for Defendants custom, practice, and policy of unreasonable seizures and excessive force. The Defendants are sued in both their individual and official capacity.

**PARTIES**

2. Plaintiff is a female individual and resident of Saint Louis County, State of Missouri, which is within the Eastern District of Missouri.

3. Defendant City of Ladue, Missouri ("Defendant City") is a Class 3 governmental entity in the State of Missouri and owns, operates, manages, directs, and controls the City of Ladue Police Department, which employs Defendant Julia Crews.

4. Defendant Julia Crews ("Defendant P.O. Crews") is and was at all times relevant to this Complaint a police officer with the City of Ladue Police Department ("LPD").  She is sued in both her individual and official capacity.

5. All actions of Defendant P.O. Crews set forth in this Petition were done under color of state law.

6. Defendant Ken Andreski ("Defendant Chief Andreski") is and was at all times relevant to this Complaint the Chief of Police with the City of Ladue Police Department.  He is sued in both his individual and official capacity.

7. Plaintiff is under information and belief that an insurance policy exists that encompasses and covers the actions of Defendants.

## JURISDICTION

8.  The allegations contained in Paragraphs 1-7 are hereby realleged and reincorporated as if fully set forth herein.

9.  Jurisdiction is proper in this Court, pursuant to 42 U.S.C. § 1331 and 42 U.S.C. § 1983, because Plaintiff's action arises under the United States Constitution and § 1343(a)(3) to redress the deprivation of rights secured by the United States Constitution.

10.  Venue is proper in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff's cause of action arises out of conduct that took place in the County of Saint Louis, State of Missouri.

11.  Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the County of Saint Louis, and Defendants reside in the Eastern Division.  E.D. Mo. L.R. 2.07(A)(1), (B)(1).

12.  This Court has supplemental jurisdiction over the included Missouri state law claims, pursuant to 28 U.S.C. § 1367.

13.  Plaintiff demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14.  The allegations contained in Paragraphs 1-13 are hereby realleged and reincorporated as if fully set forth herein.

15.  On April 23, 2019, Defendant P.O. Crews was on duty and responded to a call for service at the Ladue Schnucks grocery store located at 8867 Ladue Road, City of Ladue, St. Louis County, Missouri, a location within the Eastern District of Missouri.

16.  Defendant P.O. Crews responded to said area due to an alleged disturbance at the grocery store.

17. The aforementioned disturbance at Schnucks began inside the store and resulted in an altercation in the parking lot.

18. The aforementioned parking lot altercation resulted in Plaintiff being assaulted by Schnucks employees, who held her down on the ground.

19. Following the assault, Plaintiff left the immediate vicinity of the grocery store and began walking south through the parking lot.

20. Upon arriving in the parking lot located just south of the grocery store, Defendant P.O. Crews spotted Plaintiff.

21. Defendant P.O. Crews had been looking for Plaintiff due to her description matching that of a person of interest related to the disturbance at Schnucks.

22. Upon arriving at the scene, Plaintiff neither ran nor attempted to elude Defendant P.O. Crews.

23. Plaintiff instead approached Defendant P.O. Crews and attempted to report that she had been assaulted by Schnucks employees.

24. At no time in this entire course of events did Plaintiff have any weapons or contraband on her person.

25. The only items on Plaintiff's person were birthday balloons for Plaintiff's mother and a receipt for the same.

26. Pursuant to her Crisis Intervention Team (CIT) training, Defendant P.O. Crews recognized that Plaintiff appeared "altered," perhaps due to a mental health crisis.

27. Despite this observation, Defendant P.O. Crews either forgot or ignored her CIT training and failed to inquire if Plaintiff is on any medication, which would have indicated whether Plaintiff has a diagnosable condition.

28. Unbeknownst to Defendant P.O. Crews, Plaintiff has a history of medically diagnosed strokes, which makes communication difficult for her.

4

29. Defendant P.O. Crews informed Plaintiff that she did not believe that she was assaulted by Schnucks employees but noticed Plaintiff had been injured and requested an ambulance to respond to the scene.

30. Shortly thereafter, Ladue Police Department Police Officer Thomas Norman ("Norman") arrived on scene.

31. P.O. Norman commanded Plaintiff to sit on the curb.

32. Plaintiff followed Norman's instruction and sat on the curb.

33. Paramedics from the Ladue Fire Department arrived on scene and began to tend Plaintiff's injuries received as a result of the assault at the Schnucks.

34. Shortly thereafter, P.O. Norman radioed Ladue Police Department Lieutenant Brian Dieckmann ("Dieckmann") to apprise him of the situation.

35. In his conversation with Lt. Dieckmann, P.O. Norman informs Lt. Dieckmann that he "doubts" Schnucks employees assaulted Plaintiff and that, if Schnucks wants to press charges, Plaintiff will "probably go to jail."

36. Despite his doubts, P.O. Norman later informs Saint Louis County detectives that, during his interaction with Plaintiff, Plaintiff was "compliant" and "cooperative," and that he did not see Plaintiff as "being aggressive."

37. P.O. Norman is then ordered by Lt. Dieckmann to leave the area in order to assist another officer at Schnucks.

38. Prior to departing, P.O. Norman asks Defendant P.O. Crews if she is "good" to which Defendant P.O. Crews responds in the affirmative.

39. Following P.O. Norman's departure, Defendant P.O. Crews' demeanor changes.

40. Plaintiff had previously suffered a knee injury which made sitting difficult and painful. She attempted to rise from her sitting position on the curb to alleviate this pain but was commanded by Defendant P.O. Crews, using a loud command voice, to remain sitting.

41. Plaintiff attempted to explain to Defendant P.O. Crews that she was injured, to which Defendant P.O. Crews shouted, "I just want you to sit down!".

42. At this time Defendant P.O. Crews, without physical aggression by the Plaintiff or any type of exhibition of threat, placed her hand on her firearm.

43. Plaintiff followed Defendant P.O. Crews' instruction.

44. The pain in Plaintiff's knee became unbearable due to sitting, so Plaintiff once again attempted to stand.

45. Defendant P.O. Crews again commanded Plaintiff to sit.

46. Without warning, and with no provocation or legal cause, Defendant P.O. Crews attempted to handcuff Plaintiff, but failed.

47. Plaintiff asked Defendant P.O. Crews if she was under arrest, to which Defendant P.O. Crews answered, "No, not yet."

48. Plaintiff, understandably, began to fear for her wellbeing given the history of unarmed black individuals being shot by white officers, not only across the country, but specifically in the Saint Louis metropolitan area.

49. Further, the City of Ladue has a history of racial profiling, as evidenced by the allegations of former Chief of Police Larry White in his lawsuit against the city, wherein he claimed he was ordered by a city official to target and set ticket quotas for blacks.

50. Despite informing Plaintiff that she was not under arrest, Defendant P.O. Crews once again, suddenly and without announcement, swung her handcuffs at Plaintiff, successfully locking one bracelet around her wrist.

51. Shocked and scared, Plaintiff again asked Defendant P.O. Crews if she was under arrest.

52. Again, Defendant P.O. Crews said, "No."

53. Fearing for her safety, Plaintiff pulled her arm away from Defendant P.O. Crews and began to run towards the proximate St. Luke's Urgent Care where she felt she would be safe from this law enforcement aggression.

54. On a video recording Defendant P.O. Crews is heard exclaiming, "She's running away!"

55. In addition to her Department-issued firearm, Defendant P.O. Crews also had on her person a variety of non-lethal weapons, including a Taser X26 ("Taser"), baton, and pepper spray.

56. Despite these non-lethal options, Defendant P.O. Crews pulled out her LPD-issued firearm, a Glock 9-millimeter semi-automatic pistol, raised it to eye-level, and fired one shot at Plaintiff, striking her in the back as she ran with her arms above her head.

57. Other than shouting, "She's running away," Defendant P.O. Crews gave no additional warning to Plaintiff that Crews was about to use deadly force.

58. As a result of the gunshot wound, Plaintiff dropped to the ground incapacitated.

59. Crews approached Plaintiff and attempted to handcuff her other hand when Plaintiff exclaimed, "You shot me!"  Crews later explained to St. Louis County detectives that she thought she was using her Taser and did not realize she was using her 9MM gun until she saw Plaintiff Ashley Hall bleeding.

60. Plaintiff, in shock at being shot in the back, turned to Crews and says, "Did you shoot me?" to which Crews replies, "Yes, and I'm sorry."

61. Had Defendant P.O. Crews exercised due care, arising out of proper training, she would have noticed that she was firing her firearm, as opposed to a non-lethal weapon.  By way of example, the differences between the two include, but are not limited to, the following:

    a. Police officers keep their firearm on their right side in a "straight-draw" manner and their Taser on their left side in a "cross-draw" manner;

    b. The Taser used by P.O. Crews requires a power switch to be activated prior to firing;

    c. The Taser differs in size from the Glock;

    d. The Taser differs in weight from the Glock;

    e. The Taser is yellow in color while the Glock is black in color; and

    f. Plaintiff is under information and belief that the Taser has a built-in laser-sight while the Glock has only iron sights.

62. In addition to the above-enumerated differences, LPD training allegedly focuses on creating muscle memory in drawing and deploying the Taser and includes drills which necessitate the police officer to transition from their Taser to a firearm.

63. When asked about her knowledge of the Taser versus knowledge of the Glock, P.O. Crews informed Saint Louis County Police Department detectives that the LPD has quarterly firearm training and they occasionally throw in some "Taser stuff."

64. When asked about whether the LPD requires an officer to perform the required daily "spark test" on the Taser, P.O. Crews informs Saint Louis County Police Department detectives that she "think[s] we're supposed to," but couldn't recall the last time she performed such a test.

65. The LPD – and, by extension, Defendant City and Defendant Chief Andreski – has a policy that all officers undergo annual Taser training.

66. In Defendant P.O. Crews' 13-year tenure on the force, her Taser X26 training history is as follows:

a. On May 18, 2006, alleged Certified Instructor Steve Nunn trained Defendant P.O. Crews.   On the certificate of training, the Certified Instructor ID reads "00000000000000000000000;"

b. On March 13, 2007, alleged Certified Instructor Steve Nunn trained Defendant P.O. Crews.   On the certificate of training, the Certified Instructor ID reads "00000000000000000000000;"

c. There is no record of Defendant P.O. Crews attending Taser X26 training in 2008;

d. On October 30, 2009, Detective Thomas Norman – who was on the scene for the occurrence that is the basis of this lawsuit – trained Defendant P.O. Crews;

e. On December 3, 2010, Detective Thomas Norman again trained Defendant P.O. Crews;

f. There is no record of Defendant P.O. Crews attending Taser X26 training in 2011;

g. There is no record of Defendant P.O. Crews attending Taser X26 training in 2012;

h. On April 1, 2013, P.O. Norman again trained Defendant P.O. Crews;

i. On February 22, 2014, P.O. Norman again trained Defendant P.O. Crews;

j. On November 18, 2015, P.O. Norman allegedly again trained Defendant P.O. Crews; however, there is no certificate of training for the same;

k. On April 30, 2016, P.O. Norman allegedly again trained Defendant P.O. Crews; however, there is no certificate of training for the same;

l. On March 8, 2017, P.O. Norman allegedly again trained Defendant P.O. Crews; however, there is no certificate of training for the same; and

    m. On May 2, 2018, P.O. James Gehm trained Defendant P.O. Crews; however, there is no Certified Instructor ID on the certificate of training.

67. At no point prior to or after the shooting did Defendant P.O. Crews frisk Plaintiff for weapons or contraband, indicating that Plaintiff was a threat to neither herself nor others.

68. Furthermore, Plaintiff did nothing throughout the encounter that would justify the use of deadly force.

69. In an interview following the shooting, Defendant P.O. Crews informed Saint Louis County Police Department detectives that she was not physically injured in her encounter with Plaintiff.

70. Although Defendant P.O. Crews claimed that she was attempting to arrest Plaintiff for assault on a law enforcement officer due to Plaintiff allegedly pushing her, P.O. Crews informed Saint Louis County Police Department detectives that she could not recall what body part was allegedly pushed.

71. Plaintiff's non-threatening demeanor is further corroborated by multiple eyewitnesses to the shooting, including but not limited to the following:

    a. According to one witness interviewed by Saint Louis County Police Department detectives, Plaintiff ran away from Crews and never turned back towards her; Plaintiff had nothing in her hands as she ran; and Plaintiff never reached into her pockets or waistband. Other than Plaintiff running away, this witness saw no action that would have put Defendant P.O. Crews in "harm's way."

    b. According to a second witness interviewed by Saint Louis County Police Department detectives, Plaintiff had nothing in her hands, nor did she do anything which could be construed as hostile or threatening towards P.O.

Crews, such as reaching for her pockets or waistband or turning towards P.O. Crews while running.

c. According to a third witness interviewed by Saint Louis County Police Department detectives, Plaintiff did not run towards P.O. Crews; Plaintiff did not reach for anything which would have potentially necessitated the use of deadly force; and Plaintiff had nothing in her hands which would have necessitated the use of deadly force.

d. According to a fourth witness interviewed by Saint Louis County Police Department detectives, Plaintiff neither ran toward P.O. Crews nor did she have anything in her hands. This witness observed Plaintiff running away from P.O. Crews with her arms and hands above her shoulders until the moment she was shot.

e. Crews herself admitted to Saint Louis County detectives that she had "no recollection" of Plaintiff turning back toward her as she ran; that Plaintiff possessed nothing Crews could have perceived to be a deadly weapon or dangerous instrument; and that Plaintiff made no furtive movements in the moments prior to the shooting.

72. One of the aforementioned witnesses indicated the only abnormal demeanor throughout the situation came from Defendant P.O. Crews herself. Said witness described as the "most surprising thing" about the encounter was seeing "only fear" from Defendant P.O. Crews. This witness observed Defendant P.O. Crews' fear not only in the moments following the shooting, but that Defendant P.O. Crews appeared scared before she shot Plaintiff Ashley Hall in the back.

73. Despite the City of Ladue being one of the wealthiest cities in the State of Missouri, the LPD police officers do not have the luxury of body cameras, which allow them to mask and cover up their wrongdoing.

74. Despite being equipped with a body-worn microphone that links to her vehicle's dash camera, Defendant P.O. Crews failed to properly sync her microphone to said camera, thus allowing the LPD to further mask and cover up their officer wrongdoings.

75. Despite being equipped with a vehicle dash camera, Defendant P.O. Crews deliberately moved Plaintiff out of view of said camera.

76. Plaintiff was transported to Mercy Hospital with life-threatening and permanent injuries.

77. As a direct result of the conduct and actions of P.O. Crews, Plaintiff suffered catastrophic injuries including, but not limited to, the following:

   a. Gunshot wound to the abdomen;

   b. Spleen laceration, leading to its removal via splenectomy;

   c. Stomach laceration;

   d. Liver laceration;

   e. Diaphragm laceration;

   f. Cardiac arrest – Plaintiff was in a "code blue" for approximately two minutes while at the hospital;

   g. Atelectasis (lung collapse);

   h. Left lung contusion;

   i. Respiratory failure;

   j. Multiple closed fractures of ribs;

   k. An open fracture of one rib;

   l. Acute kidney injury;

m. Dysphagia (difficulty swallowing);

n. Fever;

o. Leukocytosis;

p. Peritonitis;

q. Persistent internal jugular clot, extending to cephalic;

r. Shock;

s. Thrombocytosis;

t. Traumatic hemorrhagic shock; and

u. Post-traumatic stress disorder.

78. The aforementioned injuries resulted in a hospital stay of approximately twenty (20) days, and will continue to require ongoing care, likely for the remainder of Plaintiff's life.

79. Plaintiff's spleen removal resulted in Plaintiff requiring a surgical mask in public in an attempt to ward off infection, causing Plaintiff embarrassment and humiliation.

80. Plaintiff has a mother and five children, all of whom are suffering as a result of Defendant P.O. Crews' conduct.

81. At no time during the above described events did Plaintiff use any force against Defendant P.O. Crews or any other police officer or do anything that would have provided Defendant P.O. Crews with any legal basis to use force against her.

82. As a result of Defendant P.O. Crews' use of force against and unreasonable seizure of Plaintiff, Plaintiff suffered catastrophic physical injuries and severe mental and emotional trauma, as described above.

83. There was no legal cause to justify the seizure of Plaintiff, and the seizure of Plaintiff was unreasonable.

84. There was no legal cause to justify the use of force against Plaintiff, and the force used against Plaintiff was unreasonable and excessive.

85. At all times relevant to this Complaint, the conduct of Defendants was a reckless disregard of Plaintiff's rights under federal and state law.

86. Plaintiff is under information and belief that the aforementioned violations of Plaintiff's constitutional rights is part of a pattern and practice of similar behavior on the part of Defendants.

87. As a direct and proximate result of the conduct of all Defendants, Plaintiff has suffered – and continues to suffer – physical and psychological harm, pain and suffering, personal humiliation, garden variety emotional distress, and other related compensatory damages.

**COUNT I:**
**THE UNLAWFUL USE OF EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS, COGNIZABLE UNDER 42 U.S.C. § 1983**
*As to Defendant P.O. Crews*

88. The allegations contained in Paragraphs 1-87 are hereby realleged and incorporated as if fully set forth herein.

89. Plaintiff Ashely Hall had a clearly established Constitutional Right to be free from the excessive use of force by Defendants.

90. Defendant P.O. Crews did not have probable cause to seize Plaintiff.

91. Defendant P.O. Crews did not have sufficient legal justification authorizing the use of deadly force.

92. The use of force by Defendant P.O. Crews was unnecessary.

93. The use of force by Defendant P.O. Crews was unreasonable under the totality of the circumstances, particularly because Plaintiff was not committing a crime, was not resisting arrest, was not acting violently or aggressively, or otherwise acting in a manner that posed any obvious danger to herself or anyone else, and therefore Defendant P.O. Crews' conduct toward Plaintiff was

in violation of Plaintiff's rights under the Fourth and/or Fourteenth Amendments to the United States Constitution.

94. By shooting Plaintiff, Defendant P.O. Crews restrained Plaintiff's freedom of movement.

95. Defendant P.O. Crews deprived Plaintiff of her right to be free from unreasonable seizure of her person and was a taking in violation of the Fourth and Fourteenth Amendments.

96. Defendant P.O. Crews engaged in this unlawful action with reckless or deliberate indifference to Plaintiff's Fourth and Fourteenth Amendment rights.

97. As a direct and proximate cause of Defendant P.O. Crews' unlawful actions, Plaintiff suffered damages, including but not limited to physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for her own safety.

98. At all times, Defendant P.O. Crews acted under color of state law.

99. As shown by the foregoing, Defendant P.O. Crews' conduct showed complete indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendant and/or to deter her and others similarly situated from such conduct in the future.

100. Plaintiff is entitled to reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive - in such an amount in excess of $75,000.00 as is deemed fair and reasonable; for reasonable attorneys' fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

**COUNT II:**
**VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS, COGNIZABLE**
**UNDER 42 U.S.C. § 1983**
*As to Defendant City of Ladue and Defendant Chief Andreski pursuant to*
*Monell v. Dept. of Social Services*

101. The allegations contained in Paragraphs 1-100 are hereby realleged and incorporated as if fully set forth herein.

102. The violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, Plaintiff's damages, and the conduct of Defendants were directly and proximately caused by the actions and/or inactions of Defendant City of Ladue and Defendant Chief Andreski, which has encouraged, tolerated, ratified, and has been deliberately indifferent to the following policies, patterns, practices, and customs, and the need for more or different training, supervision, investigation, or discipline in the areas of:

   a. Legal cause to stop, detain, arrest, and criminally charge a citizen;

   b. The use of force by police officers;

   c. The proper exercise of police powers, including, but not limited to seizures, the making of an arrest, and the use of force;

   d. Police officers' use of their status as police officers to employ the use of force or to achieve ends not reasonably related to their police duties; and

   e. The failure of police officers to follow established policies, procedures, directives, and instructions regarding training, seizures, arrests, and the use of force.

103. Defendant City of Ladue and Defendant Chief Andreski have a duty and legal obligation to properly train those who are employed as Police Officers in its Department.

104. Defendant City of Ladue's training programs are not adequate to train its Police Officers to properly handle situations like the one involving Plaintiff.

105. The actions of Defendant P.O. Crews evidence a lack of proper law enforcement training, in that:

    a.  Officer Crews drew her service weapon without legal cause or justification;

    b.  Officer Crews failed to adequately consider or utilize non-lethal force options as her training instructs;

    c.  Officer Crews improperly and without legal cause or justification escalated the encounter;

    d.  Officer Crews used improper, illegal, and Unconstitutional physical force against the Plaintiff;

    e.  Officer Crews demonstrated an unfamiliarity with her firearm, in contrast to her Taser, which can only be the result of bad training;

    f.  Officer Crews admitted to investigators that she was not complying with her training, which evidences a failure of the Department to supervise;

106. The actions of Officer Crews were a direct and proximate result of their failure to be properly trained and supervised by the City of Ladue.

107. Defendant City of Ladue has a custom of failing to properly train and instruct its police officers, to wit:

    a.  Failure to perform daily spark tests by police officers on LPD-issued Tasers;

    b.  Failure to instruct, supervise, and confirm daily spark test performance by police officers on LPD-issued Tasers;

    c.  Failure to adequately train police officers in the differences between the Taser X26 and the Glock 9-milimeter;

    d.  Failure to consistently train police officers on usage and deployment of their LPD-issued Tasers;

e. Failure to train police officers in considering the use of non-lethal force prior to escalating to lethal force;

f. Failure to provide adequate range time and practice with the Taser, including but not limited to, the deliberate choice of training focused on the police officer pulling the Taser and immediately transitioning to the Glock, essentially training officers to rely on their firearm over non-lethal alternatives;

g. Failure to adequately and consistently train officers in Crisis Intervention Team training;

h. Failure to adequately and consistently train officers in identifying individuals suffering from mental health crises;

i. Failure to adequately and consistently train officers in handling situations involving individuals suffering from mental health crises;

j. Failure to supervise officers in their overaggressive pursuit of black versus white individuals, as indicated by the 2018 Missouri Attorney General's Vehicle Stop Report, which places the Ladue Police Department as the second highest disproportion rate in the Saint Louis metropolitan area;

k. Failing to train, supervise, and ensure that Ladue Police Department police officers are properly syncing their microphone system to their dash cam system;

l. Failing to train, supervise, and ensure that Ladue Police Department police officers are properly placing their patrol cars and persons of interest in such a way that allows for dash camera footage to capture officer interaction with individuals; and

m. Failing to train officers to call for back up and/or support in escalating situations.

108. These events, individually and collectively, put Defendant City of Ladue on notice that having a professional and trained police force is essential.

109. Defendant City of Ladue knew that additional and/or different training was needed to avoid the assault and other constitutional deprivations like that suffered by the Plaintiff.

110. Defendant City of Ladue is clearly disregarding a known and obvious consequence of failing to train its police officers.

111. The failure to train evidenced by this particular assault is part of a custom and practice of Ladue.

112. In its failures, Defendant City has been deliberately indifferent to the rights of citizens such as the Plaintiff, and those failures and customs are the moving force behind, and the direct and proximate cause of, the constitutional violations Plaintiff suffered.

113. As a direct and proximate cause of Defendant City's unlawful actions, Plaintiff suffered damages, including but not limited to physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for her own safety.

114. As shown by the foregoing, Defendant P.O. Crews', Defendant City's, and Defendant Andreski's – individually and collectively - conduct showed complete indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendants and/or to deter them and others similarly situated from such conduct in the future.

115. Plaintiff is entitled to reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of

$75,000.00 as is deemed fair and reasonable; for reasonable attorneys' fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

## COUNT III:
### BATTERY
### *As to Defendant P.O. Crews*

116. The allegations contained in Paragraphs 1-115 are hereby realleged and incorporated as if fully set forth herein.

117. By shooting Plaintiff without probable cause, Defendant P.O. Crews subjected Plaintiff to harmful and offensive conduct.

118. The physical contact caused by Defendant P.O. Crews was not invited and was unwelcome.

119. Defendant P.O. Crews acted without justification or legal excuse.

120. As a direct and proximate cause of Defendant P.O. Crews' conduct, Plaintiff suffered damages, including but not limited to physical injury, emotional trauma, fear, apprehension, depression, anxiety, consternation, emotional distress, and concern for her own safety.

121. As shown by the foregoing, Defendant P.O. Crews' conduct showed complete indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendant and/or to deter her and others similarly situated from such conduct in the future.

WHEREFORE, Plaintiff prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $75,000.00 as is deemed fair and reasonable; for reasonable attorneys' fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

**COUNT IV:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
*As to Defendant P.O. Crews*

122. The allegations contained in Paragraphs 1-121 are hereby realleged and incorporated as if fully set forth herein.

123. Defendant P.O. Crews had a legal duty to protect Plaintiff from injury, and Defendant P.O. Crews breached her duty by unconstitutionally seizing Plaintiff and subjecting her to deadly force.

124. This breach was the proximate cause of damage to Plaintiff.

125. Defendant P.O. Crews should have realized that her conduct involved an unreasonable risk of causing distress.

126. Defendant P.O. Crews' actions caused Plaintiff to reasonably fear for her own person and suffer emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendant P.O. Crews' actions.

127. As shown by the foregoing, Defendant P.O. Crews' conduct showed complete indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendant and/or to deter her and others similarly situated from such conduct in the future.

WHEREFORE, Plaintiff prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $75,000.00 as is deemed fair and reasonable; for reasonable attorneys' fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

**HOLLAND INJURY LAW, LLC**

_/s/ William K. Holland_
**WILLIAM KING HOLLAND #40399**
**wholland@whollandinjurylaw.com**
**JOHN H. MOFFITT, III  #66091**
**jmoffitt@whollandinjurylaw.com**
**130 S. BEMISTON AVE., STE. 706**
**CLAYTON, MO 63105**
**(314) 888-7888 – Office**
**(314) 833-3995 – Fax**


**NEWTON BARTH, L.L.P**

**/s/Talmage E. Newton IV**
**Talmage E. Newton IV, MO56647**
**tnewton@newtonbarth.com**
**555 Washington Ave., Ste. 420**
**St. Louis, Missouri 63101**
**(314) 272-4490 – Office**

_Attorneys for Plaintiff_